IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| JAMES ROBERT BLODGETT, | CV 23–93–BU–DWM |
| Plaintiff, | |
| vs. | ORDER |
| KEVIN DOHERTY, | |
| Defendant. | |

Plaintiff James Robert Blodgett, a pretrial detainee proceeding without counsel, has filed a civil rights complaint under 42 U.S.C. § 1983, alleging that he received inadequate medical care for his heart condition at the Butte-Silver Bow City-County Detention Center in Butte, Montana.  Defendant Kevin Doherty, a registered nurse working part-time at the Detention Center, seeks summary judgment on the grounds that Blodgett failed to exhaust his administrative remedies and cannot show that Doherty acted with objective deliberate indifference.  (Doc. 49.)  Blodgett opposes.  (Doc. 53.)  Because Blodgett's constitutional claim fails on the merits, Doherty's motion for summary judgment is granted.

### BACKGROUND

While the following facts are viewed in the light most favorable to Blodgett,

1

*Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam), Blodgett's failure to file a statement of disputed facts in response to Doherty's statement of undisputed facts, (*see* Doc. 50), "is deemed an admission that no material facts are in dispute." D. Mont. L.R. 56.1(b), (d). To the extent Blodgett has identified factual disputes in his briefing, (*see* Doc. 53), those disputes are acknowledged below.

## I.    Medical Care

Doherty is a registered nurse employed by Community, Counseling, and Correctional Services, Inc., which provides nursing services to Butte-Silver Bow County Detention Center. (Doc. 50 at ¶ 1.) In connection with his employment, Doherty provides 20 hours of nursing services per week at the Detention Center. (*Id.* ¶ 2.) As part of his job duties, Doherty conducts initial assessments of new inmates, which includes checking vital signs, obtaining a health history, obtaining information on medications, and evaluating new inmates for withdrawals, suicidal ideations, and any other medical needs. (*Id.*) Doherty also reviews medical request forms that are submitted by inmates. (*Id.*) If he is unable to address an issue raised in a form, they are then addressed by the family nurse practitioner that contracts with the Detention Center. (*Id.*) Part of Doherty's duties are to schedule outside medical appointments. (*Id.* ¶ 37.)

On March 8, 2023, Blodgett was booked in the Detention Center. (*Id.* ¶ 5.)

As part of his initial medical evaluation on March 13, 2023,[1] Doherty obtained a medical history from Blodgett, and Blodgett reported that he had an enlarged heart, had been diagnosed with congestive heart failure, and had a pacemaker/defibrillator. (*Id.*) Blodgett's blood pressure was normal. (*Id.*)

Also on March 13, Blodgett submitted two medical request forms. (*Id.* ¶ 8.) On one form, he stated that he had missed an appointment with his heart doctor and needed to reschedule the appointment to have his heart monitor checked. (*Id.*) Doherty contacted the Heart Institute and learned the appointment could be rescheduled once Blodgett was released from custody. (*Id.*) In his second medical request, Blodgett claimed he needed to connect to his remote heart monitor. (*Id.*) He also claimed that he needed to have the heart monitor plugged in next to his bed. (*Id.*) On March 16, Doherty followed up with the Heart Institute about Blodgett's request. (*Id.* ¶ 9.) The provider advised that the monitor did not need to be next to Blodgett's bed for his defibrillator to work. (*Id.*) Instead, the provider indicated that the monitor could be kept in the infirmary and checked there. (*Id.*) Blodgett's defibrillator was checked on March 17. (*Id.* ¶ 10.) On March 29, Blodgett submitted a medical request form stating he needed 15 minutes with his heart monitor because his defibrillator had gone off in his sleep. (*Id.* ¶ 12.) Blodgett was placed on the heart monitor that same day. (*Id.*)

_____

[1] Blodgett disputes that he refused an evaluation on March 8. (*See* Doc. 53 at 1.)

3

Between April 1 and June 24, 2023, Blodgett made six medical requests unrelated to his heart condition. (*See id.* ¶¶ 13-18.)

On June 25, 2023, Blodgett submitted a medical request stating that he needed to have his pacemaker adjusted. (*Id.* ¶ 19.) Doherty reviewed the request and advised Blodgett on June 26 that an appointment had been made with the Heart Institute for June 27. (*Id.* ¶¶ 19–20.) Blodgett missed that appointment because transport did not take him, and it was rescheduled for July 7. (*Id.* ¶ 20.) Blodgett was seen at the Heart Institute on July 7. (*Id.* ¶ 21.) The Heart Institute recommended that he have a follow up appointment in three months and, noting his high blood pressure, suggested that his pressure be taken every other day. (*Id.*) Doherty was not aware of that suggestion. (*Id.*)

On August 21, 2023, Blodgett was seen at the St. James emergency room following an altercation at the Detention Center. (*Id.* ¶ 22.) The ER provider did not note any issues with Blodgett's blood pressure.

On August 23, 2023, Blodgett submitted a request asking if his visit with the ENT doctor had been scheduled. (*Id.* ¶ 23.) Doherty confirmed that it had. (*Id.*)

On August 30, 2023, Blodgett was seen by Dr. Kaufman for a follow-up related to his August 21 injuries. (*Id.* ¶ 24.)

On September 21, 2023, Blodgett was seen by Dr. Hull at the Heart Institute, to determine whether Blodgett could proceed with surgery for the facial injuries he

received during the August 21 altercation. (*Id.* ¶ 26.) Dr. Hull stated that an echocardiogram was needed, but he did not give any orders regarding Blodgett's blood pressure medication or blood pressure checks. (*Id.*) No issues were noted with Blodgett's blood pressure. (*Id.*) On October 6, 2023, Blodgett got an echocardiogram. (*Id.* ¶ 27.)

On November 26, 2023, Blodgett filed a grievance that he, as a cardiac patient, was required to have extra electrolytes, carbohydras, and calories in his diet that were not being provided. (*Id.* ¶ 28.) The Detention Center responded to the grievance, informing Blodgett that the meals were contracted out and the facility had no control over what was provided. (*Id.*) Blodgett did not appeal. (*Id.*) He filed another grievance that same day, alleging that his civil rights had been violated, including his right to healthcare and adequate nutrition. (*Id.* ¶ 29.) In response, the Detention Facility advised Blodgett that he was offered only basic medical care as disclosed during intake and that his meals were approved through a dietician. (*Id.*) Blodgett did not appeal. (*Id.*)

On December 1, 2023, Blodgett submitted a medical request form indicating it was time to have his pacemaker and defibrillator checked at the Heart Institute. (*Id.* ¶ 30.) Doherty responded on December 4 that Blodgett was already scheduled for a visit. (*Id.*) However, Blodgett missed his December 19 appointment because transport did not take him. (*Id.* ¶ 31.) Another appointment was scheduled, and

Blodgett was seen on January 3, 2024. (*Id.*)

On January 21, 2024, Blodgett went to St. James ER by ambulance for chest pain of an unspecified type. (*Id.* ¶ 32.) Blodgett was treated and released that night and no follow-up was scheduled. (*Id.*)

Blodgett had an appointment with the Heart Institute to have his defibrillator checked that was changed from April 4, 2024, to June 5, 2024. (*Id.* ¶ 33.)

On April 9, 2024, Blodgett submitted a medical request form stating that he was having trouble breathing, had excess water around his heart, and had not been feeling normal. (*Id.* ¶ 34.) Blodgett wanted to be moved to a cell where he could have his heart monitor. (*Id.*) Doherty had the medical request reviewed by FNP Willis who kept Blodgett's blood pressure medications the same but added an extra dose of Lasix for 5 days. (*Id.*)

On April 14, 2024, Blodgett submitted another medical request stating that he once again did not feel well and asking that he be moved to a cell where he could have his heart monitor. (*Id.* ¶ 35.) In response, Doherty hooked Blodgett up to the monitor and sent the readings to the Heart Institute, who reported that they looked good. (*Id.*)

Blodgett's June 5, 2024 appointment at the Heart Institute was rescheduled for June 25. (*Id.* ¶ 36.) Blodgett was seen that day and the Heart Institute did not issue any new orders. (*Id.*)

Although Blodgett did not submit any medical request forms asking to be seen for blood pressure checks, (*id.* ¶ 38), Doherty began performing near-weekly checks after Blodgett's ER visit in January 2024, (*id.* ¶ 39). Those readings generally reflect a moderately high blood pressure, with the highest reading being 152/94 on February 12, 2024. (*See* Doc. 50-3 at 183.)

## II.    Present Suit

On December 26, 2023, Blodgett filed the present lawsuit, alleging that Doherty provided constitutionally inadequate medical care when he failed to follow the heart doctor's written instructions and failed to adequately monitor Blodgett's blood pressure. (*See* Docs. 2, 23.) Doherty answered, (Doc. 34), and a schedule was set, (Doc. 43). Doherty now seeks summary judgment. (Doc. 48.)

LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014).

Nonetheless, the nonmoving party must identify, with some reasonable particularity, the evidence that it believes precludes summary judgment. *See Soto v. Sweetman*, 882 F.3d 865, 870 (9th Cir. 2018) (explaining that while pro se parties are exempted from "*strict* compliance with the summary judgment rules," they are "not exempt[ed] . . . from *all* compliance," such as the requirement to identify or submit competent evidence in support of their claims).[2]

### ANALYSIS

Section 1983 confers a tort remedy upon individuals "whose constitutional rights have been violated by state officials acting 'under color of' law." *Whalen v. McMullen*, 907 F.3d 1139, 1145 (9th Cir. 2018) (quoting 42 U.S.C. § 1983).  Here, Blodgett alleges that Doherty ignored his heart doctor's instructions between October 10, 2023 and January 21, 2024, which resulted in him going to the ER in January 2024 with a blood pressure of 218/128.  (*See* Docs. 23, 42.)  Blodgett claims that Doherty failed to monitor his blood pressure, check his defibrillator, or direct prison staff to place him on a low sodium diet.  (*See* Doc. 44.)  In seeking summary judgment, Doherty argues that Blodgett failed to exhaust his administrative remedies and, even if he had, cannot show that Doherty acted with objective deliberate indifference as required to maintain a Fourteenth Amendment

---

[2] Doherty's motion was accompanied by the requisite *Rand* Notice, (*see* Doc. 52), and Blodgett responded, (*see* Doc. 53).

medical care claim.  Because Doherty is correct on the merits of Blodgett's constitutional claim, his motion for summary judgment is granted.

## I.    Exhaustion

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. §] 1983 . . . or any other federal law[] by a prisoner . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This means a prisoner must "complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court."  *Woodford v. Ngo*, 548 U.S. 81, 88 (2006).  Exhaustion is mandatory. *Booth v. Churner*, 532 U.S. 731, 741 (2001); *Jones v. Bock*, 549 U.S. 199, 211 (2007).  Under the PLRA, prison regulations define the exhaustion requirements. *Jones*, 549 U.S. at 218.

The defendant bears the ultimate burden of proving failure to exhaust.  *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).  If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014).  Thus,

once the defendant has carried his burden, the prisoner must produce evidence demonstrating that "the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (internal citations and quotation marks omitted).

## A.    Butte-Silver Bow Detention Center Grievance Procedure

Under the Detention Center's grievance procedure, an inmate initiates a grievance by preparing a written document that states that date, time, officers/persons involved, and the full details of the incident being grieved, including the name of any witnesses and submits that document to a Detention Officer. (Doc. 50-2 at 5.)  The Officer then either tries to resolve the grievance or forwards it to the Shift Commander.  (*Id.*)  The Detention Officer or the Shift Commander investigates the grievance, unless obviously frivolous, and prepares a report setting forth their findings.  (*Id.*)  A copy of the report is provided to the complainant.  (*Id.*)  If the inmate is dissatisfied with the findings, he or she may file an appeal in writing, first to the Facility Chief Detention Officer and second to the Sheriff or Undersheriff.  (*Id.*)

## B.    Blodgett's Grievances

Blodgett has filed numerous grievances while at the Detention Center.  For example, in May 2023, he grieved his status as a DOC inmate, (*see* Doc. 50-3 at 36), and in November 2023, he grieved that the laundry person stole his

underwear, (*see id.* at 54). He even appealed some adverse outcomes, as shown,

for example, in a January 21, 2024 grievance regarding his mail. (*See id.* at 89,

92.) Thus, Blodgett was both aware of the grievance procedure and used it.

According to Doherty, however, Blodgett never filed a grievance related to his

blood pressure or a grievance that his defibrillator was not being checked. That

position is supported by Blodgett's Detention Center file, (*see* Doc. 50-3), which

Doherty has certified is the facility's "complete file regarding [Blodgett]," (Doc.

51 at ¶ 3). According to that file, the only two grievances Blodgett filed regarding

his diet or medical care prior to the filing of this lawsuit were both filed on

November 26, 2023. (*See* Doc. 50-3 at 57, 69.) Those grievances were responded

to, (*id.*), and Blodgett did not appeal. He filed another grievance on January 5,

2024, vaguely alleging that the facility was not taking his heart condition

"seriously" and that it was "ignoring directions from [his] heart doctor." (*Id.* at

102.) Once again, however, that grievance was responded to, (*id.*), and Blodgett

did not appeal.

   While separate from the grievance procedure, the Detention Facility has a

process in place for inmates seeking medical care. (*See* Doc. 50-2 at 2.) To

request such services, an inmate must make written request on the facility's form,

describing the medical issue. (*See id.* at 2–3.) As outlined above, Blodgett utilized

this process over fifteen times. However, he never submitted a medical request

form to receive blood pressure checks nor did he submit one requesting a low sodium diet.  Additionally, those requests related to his defibrillator were responded to.

Accordingly, at first blush it appears that Doherty is correct that Blodgett failed to exhaust.  However, Blodgett persuasively undermines this finding in two ways.  First, Blodgett disagrees with the Doherty's representation of the record presented at Doc. 50-3 as being complete.  Indeed, Blodgett argues that the file submitted by Doherty has been "doctored" to remove certain grievances and appeals.  (*See* Doc. 53 at 2.)  In support of that position, Blodgett argues that he submitted several grievances and appeals that do not appear in Doherty's file, including some that he filed with the Court.  He is at least partially correct.  For example, Doc. 8-1 contains a grievance dated January 15, 2024 regarding the lack of heat in his cell.  (*See* Doc. 8-1 at 3.)  That grievance does not appear in Doherty's file.  (*See* Doc. 50-3.)  Nor does a January 14, 2024 grievance regarding kitchen staff.  (*See* Doc. 8-1 at 2.)  Indeed, Blodgett specifically filed those grievances with the Court to demonstrate that the Detention Facility was not properly maintaining grievances and would not always retain a copy for their records.  (*See* Doc. 8.)  Additionally, as pointed out by Blodgett, while the appeals are absent, several of the grievances included in Doherty's file show that Blodgett explicitly noticed his intent to appeal.  (*See, e.g.*, Doc. 50-3 at 36 (Blodgett

12

acknowledging receipt of a copy of the response and circling the statement: "I do intend to appeal to the next level."); *see also id.* at 90–94, 102.) Blodgett has raised genuine, material disputes about the completeness of the Detention Facility's grievance records.

Second, Blodgett argues that it was not clear that medical concerns should have been, or even could have been, grieved. To his point, as explained above, the Detention Center has a separate procedure for medical claims. (*See* Doc. 50-2 at 2.) And while most jail or prison handbooks explicitly state that complaints about inadequate medical care (as opposed to a request for such care) must be grieved like any other complaint, the Detention Center's grievance procedure states that "[a] prisoner cannot grieve any outside sources such as medical, mental health, patrol or probation and parole officers, disciplinary actions, classification, or an officer performing their duties." (*Id.* at 5.) While this provision makes little sense regardless of how it is read, the inclusion of "medical" in this list could lead to reasonable confusion over whether medical issues were subject to the grievance procedure at all. This further undermines Doherty's administrative exhaustion argument.

Ultimately, Doherty is correct that the Detention Center's records show that Blodgett failed to grieve his blood pressure, defibrillator, or diet claims as required by the PLRA. However, Blodgett has raised a genuine dispute regarding the

13

completeness of those records and highlighted a potential loophole for medical claims. In light of those issues, Doherty's motion is not granted on exhaustion grounds.

## II.    Deliberate Indifference

Because Blodgett is a pretrial detainee, the constitutional requirements underlying the provision of his medical care derive from the Due Process Clause of the Fourteenth Amendment. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018). To succeed on such a claim, Blodgett must show:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* (cleaned up). Ultimately, "the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* (quotation marks and footnote omitted). "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.* (quotation marks omitted).

Doherty argues that the undisputed facts show that he was not deliberately

14

indifferent to Blodgett's medical needs.  He is correct.  As reflected above,

Doherty responded to the medical request forms submitted by Blodgett and made

his appointments with the Heart Institute.  To the extent Blodgett argues Doherty

failed to check his blood pressure daily as recommended by his heart doctor after

his July 2023 appointment, (*see* Doc. 50-3 at 148), there is no indication that

Doherty was aware of that suggestion.  To the contrary, Doherty's notes indicate

that while there would be a follow-up appointment in three months, there were "no

new orders noted."  (Doc. 50-3 at 184.)  At most, Doherty's failure to note the

medical suggestion was a lack of due care, *see Gordon*, 888 F.3d at 1125, which is

insufficient to show deliberate indifference.

Nor can Blodgett prove that the failure to monitor his blood pressure caused

specific harm.  While Blodgett alleges that Doherty's failure resulted in his January

2024 ER visit, he presents no evidence to that effect.  Neither the medical records

associated with the ER visit, (*see* Doc. 50-3 at 168–80), nor those of his subsequent

June 2024 Heart Institute appointment, (*id.* at 123), identify his blood pressure as

having either caused or been a harbinger of his chest pain.  While Blodgett himself

argues that there is a causal connection between his specific, worsening heart

condition and his blood pressure, (*see* Doc. 53 at 5–6), he has not presented any

additional expert or medical evidence to this effect.

In his response to the current motion, Blodgett goes beyond his heart issues

and appears to argue more generally that Doherty denied him care by stating, in response to several requests, that Blodgett could seek medical care for the identified issues once no longer custody.  For example, in April 2023, Blodgett requested that he be tested for sexually transmitted diseases, and Doherty responded that "[t]his is not done at the jail you can see your provider when released."  (Doc. 50-3 at 162.)  This argument goes beyond the scope of the current litigation.  To the extent that Blodgett is citing Doherty's conduct as evidence of a general disregard of Blodgett's concerns, that characterization is belied by the record.  As outlined above, the record shows that Blodgett received consistent, timely care for his medical concerns, including regular visits to the Heart Institute to monitor his heart condition.  The undisputed facts shows that Doherty did not violate Blodgett's Fourteenth Amendment rights in the provision of medical care as alleged.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Doherty's motion for summary judgment (Doc. 48) is GRANTED.  The Clerk is directed to enter judgment in favor of Doherty and against Blodgett and close the case file.

DATED this __6__ day of May, 2025.

Donald W. Molloy, District Judge
United States District Court